UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
**Urbana Division**

| | |
|---|---|
| MARIA SANTILLAN, as Special Administrator of the Estate of ESEQUIEL SANTILLAN, Deceased; RIGOBERTO LOPEZ; and AQUIELO ARIAS, Plaintiffs, v. TERRY SCHAAFSMA, doing business as The Grand Farm, doing business as Schaffsma Farm; and BRUCE SCHAAFSMA, doing business as The Grand Farm, doing business as Schaffsma Farm; Defendants. | Case No. 04-2284 |

# ORDER

In December 2004, Plaintiffs, Maria Santillan, as Special Administrator of the Estate of Esequiel Santillan, deceased, Rigoberto Lopez, and Aquileo Aria filed a Complaint at Law (#1) against Defendants, Terry Schaafsma and Bruce Schaafsma, d/b/a The Grand Farm, and d/b/a Schaafsma Farms. In June 2005, Plaintiffs filed their First Amended Complaint at Law (#25), alleging violations of the Migrant and Seasonal Agricultural Worker Protection Act (hereinafter "AWPA") (29 U.S.C. § 1801 *et seq.*) and also alleging state law claims of negligent entrustment. Federal jurisdiction is based on federal question pursuant to 28 U.S.C. § 1331 because some of the claims arise under a federal statute. The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge.

In July 2006, Defendants filed a Motion In Limine (#32). After reviewing Defendants' motion and the parties' memoranda, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion In Limine **(#32)**.

# I. Background

The following background is taken from the complaint. Plaintiff Maria Santillan is Administrator for the Estate of Esequiel Santillan. Defendants co-owned a family farming operation known as The Grand Farm or Schaafsma Farm. At relevant times, Esequiel Santillan, Rigoberto Lopez, and Aquileo Arias were migrant agricultural workers who worked for Defendants.

On September 8, 2004, Defendants transported Santillan, Lopez, and Arias in a farm truck owned by Defendants and driven by Jorge Calero, one of Defendants' employees. At the time, Defendants knew that Calero did not have a valid driver's license. During the ride, Santillan, Lopez, and Arias were ejected from the truck as a result of Calero's negligent driving. Santillan died and Lopez and Arias suffered serious personal injuries.

Plaintiffs' amended complaint alleges eight claims, as follows: Counts I and II, on behalf of Plaintiff Santillan, allege a survival action and a wrongful death action, respectively, based on violations of the AWPA. Count III, a survival action by Santillan, alleges that Defendants negligently entrusted their truck to Calero whom they knew or should have known was inexperienced, unlicensed, and/or incompetent. Count IV also alleges negligent entrustment and seeks damages based on wrongful death for Santillan's next of kin. In Count V, Plaintiff Lopez alleges that Defendants violated the AWPA. In Count VI, Lopez alleges negligent entrustment. In Counts VII and VIII, respectively, Plaintiff Arias alleges that Defendants violated the AWPA and also alleges negligent entrustment.

# II. Analysis

In their motion, Defendants have asked the Court to bar testimony from Plaintiff's disclosed expert, Dr. Stan Smith. Plaintiff intends to introduce Dr. Smith, an economist, to offer opinions regarding the following components of damages related to the death of Esequiel Santillan: (1) loss of wages, benefits, and social security income; (2) loss of household/family housekeeping and management services; (3) loss of household/family guidance services; (4) loss

of household/family accompaniment services; (5) loss of value of life; and (6) loss of society. *See* Smith letter dated August 29, 2005.

Expert testimony may be proffered if it is scientific, technical, or other specialized knowledge and it will "assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. The court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid" and whether "that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594 (1993). Thus, the *Daubert* test for admissibility requires scientific validity and "fit." *Ayers v. Robinson*, 887 F. Supp. 1049, 1058 (N.D. Ill. 1995). Courts are split on whether to allow expert testimony regarding hedonic damages.[1] *See Sheck v. Dalcorso*, BUR-L-932-02, 2005 WL

---

[1] According to *Sheck*, the following courts have allowed expert testimony on hedonic damages: *Smith v. Ingersoll-Rand Co.,* 214 F.3d 1235 (10th Cir. 2000); *Banks v. Sunrise Hotel,* 102 P.3d 52 (Nev. 2004); *Couch v. Astec Indus., Inc.,* 53 P.3d 398 (N.M. Ct. App.), *cert. denied,* 132 N.M. 551 (2002); *Lewis v. Alfa Laval Separation, Inc.,* 714 N.E.2d 426 (Ohio Ct. App. 1998); *see also Sherrod v. Berry,* 827 F.2d 195 (7th Cir. 1987), *vacated and remanded on other grounds,* 856 F.2d 802 (7th Cir. 1988) (en banc). Courts rejecting the use of expert testimony on hedonic damages include: *Mercado v. Ahmed,* 974 F.2d 863 (7th Cir. 1992); *Saia v. Sears Roebuck & Co., Inc.,* 47 F. Supp.2d 141 (D.Mass. 1999); *Ayers v. Robinson,* 887 F. Supp. 1049 (N.D. Ill. 1995); *Hein v. Merck & Co., Inc.,* 868 F. Supp. 230 (M.D. Tenn. 1994); *Montalvo v. Lapez,* 884 P.2d 345 (Haw. 1994); *Patch v. Glover,* 618 N.E.2d 583 (Ill. App. Ct. 1993); *Fetzer v. Wood,* 569 N.E.2d 1237 (Ill. App. Ct. 1991); *South Lake Limousine & Coach, Inc. v. Brock,* 578 N.E.2d 677 (Ind. Ct. App. 1991); *Foster, Jr. v. Trafalgar House Oil & Gas,* 603 So.2d 284 (La. Ct. App. 1992); *Anderson v. Neb. Dep't of Soc. Servs.*, 538 N.W.2d 732 (Neb. 1995); *Wilt v. Buracker,* 443 S.E.2d 196 (W.Va. 1993). *Scheck*, 2005 WL 3543177, at *5. \

The *Scheck* court also noted that various articles have addressed the issue and the majority of those articles "have questioned the science behind the expert testimony as well as whether that testimony would aid the jury." *Id.,* citing Andrew J. McClurg, *It's a Wonderful Life: The Case for Hedonic Damages in Wrongful Death Cases,* 66 Notre Dame L.Rev. 57 (1990); Ted R. Miller, *Public Policy: Willingness to Pay Comes of Age: Will the System Survive?,* 83 N. U.L.Rev. 876 (1989); Victor E. Schwartz & Cary Silverman, *Hedonic Damages, the Rapidly Bubbling Cauldron,* 69 Brooklyn L.Rev. 1037 (2004); Joseph I. Kuiper, Note, *The Courts, Daubert, and Willingness-to-Pay: The Doubtful Future of Hedonic Damages Testimony Under the Federal Rules of Evidence,* 1996 U. Ill. L.Rev. 1197; Erin A. O'Hara, Note, *Hedonic Damages for Wrongful Death: Are Tortfeasors Getting Away With Murder?,* 78 Geo. L.J. 1687 (1990); Dennis C. Taylor, Note, *Your Money or Your Life?: Thinking About the Use of*

3543177, *5 (N.J. Super. App. Div. Dec. 29, 2005) (unpublished) (listing cases).

Defendants argue that Smith's testimony regarding the hedonic value of life (also called hedonic damages) fails to satisfy the requirements set out in *Daubert*. Two of Smith's categories of damages, loss of value of life and loss of society or relationship, are based on hedonic damages. Smith defines the hedonic value of life as "the value of the pleasure, the satisfaction, or the 'utility' that human beings derive from life, separate and apart from the labor or earnings value of life." *Ayers*, 887 F. Supp. at 1051 (citing Stan Smith and Michael Brookshire, *Economic/Hedonic Damages: The Practice Book for Plaintiff and Defense Attorneys* 164 (1990 with 1992/93 cum. supp.) (hereinafter "*Hedonic Damages*")). Smith claims to be able to put a dollar figure on those intangibles.

In determining admissibility of expert testimony, the Court must focus solely on principles and methodology, not on the conclusions that they generate. *Ayers*, 887 F. Supp. at 1051 (citing *Daubert*, 509 U.S. at 580). Here, Smith bases his calculation of the hedonic value of life on studies and surveys of society's willingness to pay to achieve a reduction in the prospect of death for a statistically-average person. These studies fall into three broad categories: Studies of consumer behavior and purchases of safety devices, studies of wage risk premiums to workers, and cost-benefit analyses of safety regulations. (Smith letter, p. 6.) The studies "show the value of life to range from approximately $1.6 million to $4.7 million" in 1988 dollars. (Smith letter, p. 6 (citing T. R. Miller, *The Plausible Range for the Value of Life* (hereinafter "*Plausible Range*"), Journal of Forensic Economics, Fall 1990, pp. 17-39)). Based on these studies, Smith stated, "[o]verall, based on the peer-reviewed economic literature, I estimate the central tendency of the range of the economic studies to be approximately $3.7 million in year 2005 dollars" for the statistically average life. (Smith letter, pp. 6-7.) If Smith is allowed to testify, he would testify that Esequiel Santillan's lost value of life, which is based on Smith's calculations of the hedonic value of life, is approximately $1,854,831.

---

*Willingness-to-Pay Studies to Calculate Hedonic Damages,* 51 Wash. & Lee L.Rev. 1519 (1994).

Smith's calculation of the value of loss of relationship or society also begins with the hedonic value of life for a statistically-average person. Specifically, Smith states that the "value of the loss of society or relationship by family members with the deceased can be based on a measure of the value of preserving the ability to live a normal life," which he bases on studies regarding society's "willingness-to-pay" to preserve the ability to live a normal live. (Smith letter, p. 7.) From that point, Smith states as follows: "Based on a benchmark loss of 35 percent for Mr. Santillan's wife and 20 percent for Mr. Santillan's children, my opinion of the loss of relationship as a result of the death of Esequiel Santillan is as follows." (Smith letter, p. 7.) He opines that the value of the loss of society or relationship for Esequiel's wife and children is between $704,000 and $883,000 per person. (For exact figures, see Smith letter, p. 7.) He notes that the trier-of-fact may adjust these figures to take into account "special qualities or circumstances [for which] economists do not as yet have a methodology for analysis." (Smith letter, p. 7.)

### A. Hedonic Damages

Defendants' argument focuses on hedonic damages. Defendants contend that Smith's method of calculating hedonic damages fails to satisfy the *Daubert* standard for scientific evidence and, as a result, his testimony that is based on hedonic damages fails to satisfy Federal Rules of Evidence 702 and 403.

Plaintiffs respond as follows:

> [D]efendants have failed to identify the specific opinions of Dr. Smith that they seek to exclude. They do not counter the bases for the opinions that he presents in his report. They do not make any showing that the assumptions upon which Judge Shadur's ruling [in *Ayers*] were based are currently accepted in the field of economists. Essentially, defendants do not provide the data on which a proper *Daubert* analysis can be made.

Memorandum of Law in Opposition to Defendants' Motion in Limine, #39, p. 3. In support of their contention that Smith's testimony on hedonic damages should be allowed, Plaintiffs rely on a pre-*Daubert* decision in which the Seventh Circuit found that the trial court did not abuse its discretion by admitting Smith's "loss of life" testimony in an action under 42 U.S.C. § 1983. *See*

5

*Sherrod v. Berry,* 827 F.2d 195, 205-06 (7th Cir. 1987), *vacated,* 835 F.2d 1221, *rev'd and remanded,* 856 F.2d 802 (7th Cir. 1988). In *Sherrod*, the defendant objected that Smith's testimony was too speculative to be admissible. In approving the admission of the testimony, *Sherrod* noted that it is well-settled that Section 1983 permits recovery on behalf of a victim's estate for loss of life. *Id.*, 827 F.2d at 205. Turning to the question of whether the evidence was too speculative to be admissible, *Sherrod* approved the trial court's reasoning that the rule against recovery of "speculative damages" applies where it is uncertain whether a defendant caused the damages or whether the damages flowed from his act. *Id.* The fact that the measure or extent of injury suffered was uncertain did not bar recovery. *Id.* at 206. The court then stated that Smith's testimony "was invaluable to the jury in enabling it to perform its function of determining the most accurate and probable estimate of the damages recoverable for the hedonic value of [the decedent's] life." *Id.*

*Sherrod's* reasoning does not apply to Defendants' argument in this case. Here, Defendants do not argue that the evidence is "speculative" in the sense that it is uncertain whether Defendants caused the alleged damages. Instead, Defendants argue that the evidence does not satisfy the *Daubert* standard – an issue not raised in *Sherrod*. *See also Mercado v. Ahmed,* 756 F. Supp. 1097, 1101 n.9 (N.D. Ill. 1991) (stating that the *Sherrod* opinion's discussion of hedonic damages is not binding precedent), *aff'd*, 974 F.2d 863 (7th Cir. 1992).

In *Mercado v. Ahmed*, another pre-*Daubert* case, the Northern District court barred Smith's testimony regarding hedonic damages. *Mercado*, 756 F. Supp. 1097. There, the plaintiff sought to introduce expert testimony by Smith concerning the plaintiff's future loss of enjoyment of life as a result of injuries sustained when the plaintiff was hit by a taxi. The court found that such economic testimony was not sufficiently reliable to be introduced as expert testimony because "there is no basic agreement among economists as to what elements ought to go into life valuation." *Id.* at 1103. The court also noted that much of Smith's scientific data is based on surveys of others' views and attitudes. *Id.* Thus, the court concluded that, "[w]hat is wrong here is not that the evidence is founded on consensus or agreement, it is that the

consensus is that of persons who are no more expert than are the jurors on the value of the lost pleasure of life." *Id.*

In support of their motion to exclude Smith's testimony that is based on hedonic damages, Defendants rely on *Ayers v. Robinson*, a post-*Daubert* case in which the Northern District court barred Smith's testimony regarding hedonic damages. *Ayers* thoroughly analyzed the willingness-to-pay methodology as set forth in Smith's book and other sources and concluded that it did not satisfy the *Daubert* requirements of scientific validity and "fit." *Ayers*, 887 F. Supp. at 1051, 1058.

Regarding the $3.5 million figure that Smith provided as a "benchmark" for the hedonic value of life of a statistically-average person, the *Ayers* decision stated as follows:

> [T]o locate its $3.5 million benchmark within the broad range of values contained in the willingness-to-pay literature, *Hedonic Damages* employs a simple eyeballing technique. Eyeballing may have the advantage of ease, but it surely lacks scientific reliability in the sense of producing consistent results ([*Daubert*, 509 U.S. at 590] n.9, 113 S.Ct. at 2795 n.9). Anyone can look at the same range and come up with a different figure.

*Id.* at 1060. The court next noted as follows:

> [Economists have] widely divergent views . . . concerning what does and does not constitute . . . a sound study . . . . It is also beyond cavil that the dozen-or-so economists who used BLS [(Bureau of Labor Statistics)] and SOA [(Society of Actuaries)] data in their own wage-risk studies disagree sharply with *Plausible Result* [(*sic*)] as to the quality of those statistics.

*Id.* at 1061. The decision also objected to Smith's use of Adam Smith's 1976 work *An Inquiry into the Nature and Causes of the Wealth of Nations* (Edwin Cannan ed., Univ. of Chi. Press 1976) to lend pedigree to his theory, stating that "[v]ery little in the classic *Wealth of Nations* supports the *Hedonic Damages* method of valuing life, and much counsels against it." *Id*. at 1062. Finally, the court stated as follows:

> As to the basic assumption underlying the economic model–that the amount of individuals' willingness-to-pay for small reductions in the likelihood of death reflects how society values life–this Court shares many of the concerns expressed by our Court of Appeals in *Mercado,* 974 F.2d at 868-71 and mirrored in much of the academic literature [(citations omitted)]. Those criticisms focus on (1) the

7

assumption that people have freedom of choice in deciding to confront risk, (2) the assumption that people perceive risk accurately, (3) the nonmonetary factors that drive many consumer purchases (e.g., advertising) and employment decisions (e.g., civic pride), and (4) the political aspects of government regulation (e.g., budgets, lobbyists). This Court agrees that those considerations go a long way toward undermining the basic premise behind the willingness-to-pay model.

. . . For current purposes it is unnecessary to decide whether there has been enough testing or peer review of the underlying theory to constitute scientific knowledge. Stripped of its empirical moorings, Schelling's[2] basic insight into risk and the value of life cannot possibly assist the jury in calculating damages, so it is plainly inadmissible under the helpfulness prong of Rule 702–regardless of its fate under Rule 702's scientific knowledge requirement.

*Ayers*, 887 F. Supp. at 1063.

This Court has reviewed the case law, Smith's letter, and the parties' memoranda. Based on that information, the Court agrees with the Northern District court's well-reasoned conclusion that Smith's testimony regarding hedonic damages does not satisfy the *Daubert* requirements. Accordingly, the Court concludes that Smith's testimony related to hedonic damages resulting from the death of Esequiel Santillan is inadmissible. As noted above, Smith's opinions on the loss of value of life and loss of society or relationship are both based on his hedonic damages calculations. Accordingly, the Court grants Defendants' motion to exclude Smith's testimony relating to loss of value of life and loss of society.

---

[2]The *Ayers* court had previously stated as follows:
[T]he genesis of the willingness-to-pay method of valuing human life is T.C. Schelling's *The Life You Save May Be Your Own* (reprinted in the Brookings Institution's study *Problems in Public Expenditure Analysis* (Samuel Chase, Jr. ed., 1966)). In that piece Schelling set out the model's basic framework, and nothing has really changed in that respect since. Schelling's purpose was to suggest a method of conducting cost-benefit analyses in the context of proposed safety regulations.

*Ayers*, 998 F. Supp. at 1063.

### B. Other Damages

Defendants' motion states that *Ayers* also addressed damages for loss of household/family guidance services and loss of household/family accompaniment services. Other than this statement, the motion does not discuss these elements of Smith's testimony, nor does it discuss Smith's opinions regarding loss of wages, benefits, and social security income or loss of household/family housekeeping and household management services.

Plaintiffs note that the *Ayers* case dealt exclusively with hedonic damages. The Court agrees. Unlike loss of value of life and loss of society, the categories of damages listed in the previous paragraph are not based on Smith's hedonic damages methodology. Thus, Defendants have provided no argument regarding the categories of damages listed in the previous paragraph. Accordingly, to the extent that Defendants' motion in limine seeks to bar testimony regarding damages that are not based on the hedonic value of life, the Court denies the motion. Specifically, the Court denies Defendants' motion to exclude Smith's testimony regarding (1) loss of wages, benefits, and social security; (2) loss of household/family housekeeping and management services; (3) loss of household/family guidance services; and (4) loss of household/family accompaniment services.

### III. Summary

For the reasons set forth above, the Court **GRANTS** Defendants' Motion In Limine **(#32)** as to testimony regarding loss of value of life and loss of society and **DENIES** it as to other categories of damages.

ENTER this 11th day of September 2006

                                              s/ DAVID G. BERNTHAL
                                              U.S. MAGISTRATE JUDGE